751 N.E.2d 690 (2001)
In the Matter of A.H., A Child Alleged to be in Need of Services,
A.H., Richard Halberstadt and Diane Halberstadt, Appellants-Respondents,
v.
The Bartholomew County Office of Family and Children, Appellee-Petitioner.
No. 03A01-0011-JV-403.
Court of Appeals of Indiana.
June 4, 2001.
Publication Ordered July 2, 2001.
*692 David E. Dearing, Indianapolis, IN, Jeffrey L. Beck, Beck Harrison & Dalmbert, Columbus, IN, Jennifer Auger, Jones Hoffman & Admire, Franklin, IN, Attorneys for Appellants.
Stanley A. Gamso, Lawson Pushor Mote & Gamso, Columbus, IN, Attorney for Appellee.

*691 OPINION
SHARPNACK, Chief Judge.
Richard Halberstadt ("Father"), Diane Halberstadt ("Mother"), and A.H. (collectively, *693 "the Halberstadts") appeal the juvenile court's order determining that A.H. is a child in need of services ("CHINS") and the dispositional order following that determination. On appeal, the Halberstadts raise three issues,[1] which we restate as:
1. whether sufficient evidence supports the juvenile court's determination that A.H. is a CHINS;
2. whether the juvenile court's dispositional decree is in conformance with the controlling statute; and
3. whether the juvenile court's order must be reversed because the Halberstadts' due process rights were violated when the Bartholomew County Office of Family and Children ("BCOFC") failed to provide a case plan to the Halberstadts as required by law.
We affirm.
The facts most favorable to the trial court's order follow. A.H. (age 15) has myoclonus, a medical condition that causes rhythmic contractions in her abdominal region. To control the myoclonus, A.H. was prescribed a number of medications. The doctor who treated A.H. for this condition told A.H.'s parents that they should place a hand on A.H.'s stomach, specifically her navel, after she had gone to sleep to determine whether the contractions occurred while A.H. was sleeping. Because Mother worked third shift, this testing was Father's responsibility on the nights that Mother worked. During the summer of 1999, on five or ten of the occasions when Father checked A.H.'s stomach, he rubbed A.H.'s groin area and stuck his finger in her vagina. When A.H. moved, Father jerked away and went to the bathroom to wash his hand. Then, he came back and tried it again. On another occasion, when Father came to A.H.'s room to check her stomach while she was sleeping, Father placed his hand down A.H.'s pants into her pubic hair, and when he tried to remove his hand, he got his hand caught in the string of her underpants. A.H. told Mother that Father had been touching her inappropriately. However, Mother did not believe her and told her that she was hallucinating from the myoclonus medications.
During that same summer, A.H. sleepwalked into her parents' bedroom and crawled into bed with Father. Father put his arm around A.H., put his hand down her pants, and inserted his finger in her vagina. When Father reached around and felt A.H.'s breasts, he stated that he had been asleep and mistakenly thought A.H. was Mother.
On July 17, 1999, A.H. went to a birthday party for a fourteen-year-old friend, E.M. During the birthday party, A.H. told E.M. that Father had been molesting her two or three times a week for the previous two or three months. Eventually, E.M. reported A.H.'s story to a school counselor. Evidently, the school counselor relayed E.M.'s report to the BCOFC, because a family case manager from the BCOFC, Sheryl Alyea, and an Indiana State Police Detective, Robert Bays, Jr., went to E.M.'s school and interviewed E.M. On September 2, 1999, Alyea and Detective Bays interviewed A.H. while she was staying in the hospital for treatment related to her myoclonus.
On September 7, 1999, the juvenile court held an emergency hearing. At that hearing, the judge found probable cause to *694 believe that A.H. was a CHINS. The judge ordered A.H. to be detained by the BCOFC, and A.H. was placed in foster care. After the juvenile court judge authorized the BCOFC to file a CHINS petition, the BCOFC filed a petition alleging that A.H. was a CHINS because "her father has been sexually molesting her for the past two to three months" and "her mother does not believe the child is truthful" when she reports the incidents. Record, p. 1. The BCOFC specifically alleged that these acts by A.H.'s parents resulted in A.H. meeting the requirements for three different statutory definitions of CHINS, Ind.Code §§ 31-34-1-1, 31-34-1-2, and 31-34-1-3.[2]
Following a status hearing on December 15, 1999, the juvenile court ordered that A.H. could move home to live with her mother, but that Father had to move out of the home. Father was not allowed to have contact with A.H., except for supervised visits at the BCOFC office. In addition, the court order required Mother to undergo psychological tests evaluating her fitness as a parent. At a six-month review hearing on March 1, 2000, the court ordered A.H. to stay with Mother, ordered Father to remain out of the home, and ordered that Father's visitation with A.H. could occur under the supervision of either the BCOFC or Mother's parents.
Subsequently, on July 14, 2000, at the conclusion of a four-day fact-finding hearing, the juvenile court entered findings of fact and conclusions of law regarding the CHINS petition. The juvenile court concluded that A.H. was a CHINS under all three of the statutory definitions that the BCOFC had alleged. On October 12, 2000, the juvenile court entered a dispositional order requiring A.H. to live with Mother, while Father maintained residence elsewhere. In addition, the Halberstadts were to be evaluated at the Indianapolis Institute for Marital and Family Relations, Inc. to develop "a comprehensive plan of care, treatment and rehabilitation." Record, p. 332.
When a court's orders contain specific findings of fact and conclusions of *695 law, we engage in a two-tiered review. Hallberg v. Hendricks County Office of Family and Children, 662 N.E.2d 639, 643 (Ind.Ct.App.1996). First, we determine whether the evidence supports the findings. Id. Then, we determine whether the findings support the judgment. Id. We only reverse the trial court's judgment if it is clearly erroneous. Id. A judgment is clearly erroneous if it is unsupported by the findings and conclusions. Id. Findings of fact are "clearly erroneous when there is no substantial evidence of probative value to support the findings." In re E.M., 581 N.E.2d 948, 952 (Ind.Ct. App.1991), trans. denied. When deciding whether the findings are clearly erroneous, we consider only the evidence and reasonable inferences therefrom that support the judgment. Id. We cannot reassess the credibility of the witnesses or reweigh the evidence. Id.

I.
The first issue is whether sufficient evidence supports the juvenile court's determination that A.H. is a CHINS. When we review the sufficiency of evidence, we consider only the evidence and reasonable inferences therefrom that are most favorable to the judgment. Hallberg, 662 N.E.2d at 646. We neither reweigh the evidence nor reassess the credibility of the witnesses. Id. The BCOFC was required to prove by a preponderance of the evidence that A.H. was a CHINS. See id. at 647.
The Halberstadts argue that the evidence does not support three of the trial court's findings. First, they argue that the evidence does not support the finding that Father abused A.H. Second, they argue that the evidence does not support the finding that Father sent a pornographic picture to A.H. via e-mail. Third, the Halberstadts argue that "[t]he evidence does not support the finding that [Mother] failed to protect A.H." Appellant's brief, p. 29. We will address each of these arguments in turn.

A.
The Halberstadts first allege that the evidence does not support the juvenile court's finding that Father abused A.H. They provide four different arguments regarding why the evidence did not support the court's finding. Initially, the Halberstadts argue that "the juvenile court did not explicitly find that Father molested [A.H.]." Appellant's brief, p. 16. However, the juvenile court did find that "A.H. is a victim of the offense of Sexual Misconduct with a Minor as defined in I.C. § 35-42-4-9."[3] Record, p. 247. As Father was the person alleged to have molested A.H., this finding by the juvenile court indicates that it did explicitly find that Father molested A.H.
Next, the Halberstadts argue that the "[BCOFC] did not attempt to prove the truth of the allegations against [Father.]" Appellant's brief, p. 17. They base this argument on comments made by two case managers from the BCOFC who, according *696 to the Halberstadts, "testified, in essence, that the truth of the abuse allegations was not a factor in their work." Id. A review of the testimony surrounding the two quotes cited by the Halberstadts leads us to a different conclusion than the Halberstadts reached. What both case managers testified to is that when a child makes an allegation of sexual abuse by her father that results in the child being removed from the home and in the family being involved in a legal proceeding, then, regardless of whether the allegation of abuse is true or not, the child and the family need counseling. Moreover, even if the Halberstadts' interpretation of the case managers' comments was correct, the facts of the matter are that the BCOFC filed a CHINS petition alleging that Father sexually abused A.H., they investigated the allegation, they attended numerous hearings, and they presented testimony to support the allegation. These actions indicate that the BCOFC was attempting to prove the truth of the allegations against Father. Consequently, this argument by the Halberstadts is without merit.
Next, the Halberstadts argue that "[t]he juvenile court mischaracterized [A.H.]'s statements to Bays and Alyea" in findings of fact numbers seven and eight. Appellant's brief, p. 18. Finding of fact number seven is that "A.H. reported to Detective Bays and Sheryl Alyea that she slept walked [sic] into Father's bedroom, and that Father inserted his finger into her vagina and felt her breasts." Record, p. 241. The Halberstadts argue that, because Father has maintained all along that he believed that A.H. was Mother when he committed these acts, this finding incorrectly implies that Father knew that he was touching A.H. when he touched her breasts and vagina. However, this finding does not imply whether Father knew or did not know whom he was touching. Instead, this finding is a correct factual statement of the evidence in the record indicating that when A.H. sleepwalked into Father's bedroom and crawled into his bed, Father inserted his finger in her vagina and touched her breasts.
Finding of fact number eight provides:
8. A.H. reported to Detective Bays and Sheryl Alyea that [Father] would come into her room on numerous occasions to check her stomach seizures; on approximately five to ten of those occasions, he would put his hand "way down" her pants; would rub her vagina; and, would touch her pubic hair. She reported that he would go in the bathroom afterward, and she could hear running water as if he was washing his hands.
Record, p. 241. The Halberstadts argue that this finding ignores A.H.'s repeated statements that Father did not touch her inappropriately.
The transcript of Detective Bays and caseworker Alyea's interview with A.H. contained the following dialogue:
[Bays]: so how many times ... your Dad goes in and checks your, your abdomen ... at night
[A.H.]: they said that they've done it a hundred times
[Bays]: how many times did you feel something inappropriate happen
[A.H.]: more than once
[Bays]: fifty
[A.H.]: no. .... five
[Bays]: about five
[A.H.]: five, ten ... I don't know
[Alyea]: five or ten times
[A.H.]: yeah
[Bays]: what happened then
[A.H.]: once I fell off the bed cause I tried to move and that others ... and then when I did move he would jerk away ... and that told me something *697 because I mean .. if he was check[ing] for the stomach and I move you don't jerk away. You know he'd keep his hand on my stomach if he was just checkin[g].
Record, p. 890. Later in the same interview, A.H., Detective Bays, and case manager Alyea had the following discussion:
[Bays]: so when you're in bed you said... tell me again how he got his hand stuck on you, on your pants
[A.H.]: ok he, he.. put his.. put his hand on my stomach just you know cause their [sic] supposed to check my abdominal myoclo[n]us at night and um... he walked in there, he stuck his hands down through the ribbon of my pants and I thought he stuck his hand all the way down my pants ... but he, he swears up and down that he didn't... and
[Bays]: well what did you feel
[A.H.]: I felt his hand
[Bays]: and where was his hand at
[A.H.]: down there ... down .. way down here ... in my pants
[Bays]: doin[g] what
[A.H.]: I don't ... just ... his hand was just like layin[g] there
[Bays]: where was it at
[A.H.]: it was like right where my pubic hair is
Record, p. 885(b). Even later in the interview, the following discussion occurred:
[Bays]: um one other thing I want to touch on here real quick. These five to ten other times that it happened prior to this
[A.H.]: yeah
[Bays]: how was he touching you inappropriately
[A.H.]: he was rubbing me
[Bays]: rubbing you
[A.H.]: yes
[Bays]: where
[A.H.]: my vagina
[Bays]: on your vagina
[A.H.]: yeah. ..... (pause) ... And he would try to stick his finger in and I would move and he would jerk away. And then he would go in the bathroom and I would hear water running like he was washin[g] his hands and come back in there and try it again
Record, p. 904. This evidence supports the trial court's finding; therefore that finding is not clearly erroneous. See, e.g., Hallberg, 662 N.E.2d at 646-647 (holding that evidence was sufficient to support court's finding that child was a CHINS due to being sexually abused by her father). Any inconsistencies in A.H.'s statements were for the finder of fact to resolve, and we may not reweigh the testimony or reassess the credibility of witnesses on appeal. See id. at 646.
Finally, the Halberstadts argue that the "evidence failed to support the finding that [A.H.]'s allegations of abuse were not influenced by her drug regimen." Appellant's brief, p. 22. The Halberstadts allege that to reach this conclusion, the juvenile court was required to ignore uncontradicted expert testimony.
A pharmacist and a psychiatrist testified that the medications that A.H. was taking could have side effects, including confusion, sleepiness, amnesia, intoxication, and sedation. However, the Halberstadts do not point to testimony by these experts indicating that A.H. was actually experiencing these side effects when she gave her report of sexual abuse to Detective Bays and case manager Alyea. Instead, the record indicates that hospital personnel checked A.H. numerous times over a number of days, and their reports indicate that, on the day that Alyea and Detective Bays interviewed her, A.H. was *698 oriented to person, time, and place. The juvenile court did not err in placing greater weight on actual evidence of A.H.'s mental status than it placed on expert evidence about what A.H.'s mental status could have been. See, e.g., Fordyce v. State, 425 N.E.2d 108, 110 (Ind.1981) (quoting Murphy v. State, 265 Ind. 116, 128, 352 N.E.2d 479, 486 (1976) ("The weight to be accorded expert testimony as well as lay testimony, is the exclusive province of the trier of fact which is at liberty to discount it or to reject it in the face of lay testimony, which it finds more persuasive.")). As there is testimony in the record to support the findings of the juvenile court, those findings are not clearly erroneous, and we may not reweigh the evidence on appeal. See, e.g., Roark v. Roark, 551 N.E.2d 865, 871 (Ind.Ct.App. 1990).
In summary, the record indicates that four people, including Alyea and Detective Bays, testified that A.H. told them that Father had come into her bedroom and touched her inappropriately on a number of occasions. This evidence is sufficient for the juvenile court to have found by a preponderance of the evidence that Father abused A.H. by committing sexual misconduct with a minor as defined in Ind.Code § 35-42-4-9. See, e.g., Hallberg, 662 N.E.2d 647.

B.
The second finding that the Halberstadts challenge is that Father sent a pornographic picture to A.H. via e-mail. The juvenile court found that "A.H. showed Dee Ann Hitchcock inappropriate e-mail pictures and messages sent to her by [Father], including a picture of a young child with an enlarged penis." Record, p. 242.
The Halberstadts argue that the evidence does not support the finding that Father sent the picture because a computer technology expert witness testified that it was impossible to verify who sent the e-mail, that the recipient could have edited the e-mail, and that the fact that the document was printed from a folder of sent messages suggests that the printing was completed from the computer where the picture was created. Moreover, the Halberstadts argue that there was evidence to support a finding that Dee Ann Hitchcock was responsible for creating the pornographic picture.
However, in making these arguments, the Halberstadts ignore the evidence in the record that does support the juvenile court's finding. First, the e-mail heading indicates that the message came from Father's e-mail address at work. Second, Dee Ann Hitchcock testified that A.H. showed her the picture in late October of 1999 and told her that the picture came from Father. On appeal we are constrained to view only the evidence most favorable to the judgment, and we are not permitted to rejudge the credibility of the witnesses or reweigh the evidence. Hallberg, 662 N.E.2d at 646. In addition, we must be mindful of the fact that the trier of fact is permitted to give more weight to lay testimony than to expert testimony. Fordyce, 425 N.E.2d at 110. Viewed in this light, the evidence supports the juvenile court's finding that Father sent the e-mail to A.H. See, e.g., Roark, 551 N.E.2d at 871.

C.
The final finding that the Halberstadts challenge is that Mother failed to protect A.H. Specifically, the Halberstadts allege that A.H.'s statement to Detective Bays and case manager Alyea "lacks credibility due to the influence of the drugs that she was taking." However, we are not permitted on appeal to rejudge the credibility *699 of A.H.'s statement and reweigh its value in comparison with all the other evidence that was presented. Hallberg, 662 N.E.2d at 646.
Moreover, the report from Detective Bays and case manager Alyea was not the only testimony indicating that Mother failed to believe A.H. when she told Mother about the abuse. E.M. testified that A.H. told her that on two occasions she informed Mother that Father was molesting her but that Mother did not believe her and that Mother instead insisted that her medication was causing her to think that the abuse happened. Hitchcock also testified that she and A.H. discussed the abuse by Father and that during those conversations A.H. mentioned that she was upset because Mother did not believe her.
The Halberstadts also claim that the sleepwalking incident and the time when Father got his hand caught in the ribbon of A.H.'s pants were both accidents and that therefore "there was no reason for [Mother] to throw [Father] out of the house and there was nothing to report to the authorities." Appellant's brief, p. 29. However, this argument ignores the finding that Father touched A.H. inappropriately on more than just those two occasions. Record, p. 241. They further claim that Mother did do something to protect A.H. because Mother "immediately questioned [Father] about what happened" and "arranged for [A.H.] to receive counseling[.]" Appellant's brief, p. 29. However, questioning Father and arranging counseling for A.H. did nothing to remove Father's opportunity to molest A.H. in the future. This was the danger that A.H. was exposed to by Mother's failure to protect her, and the evidence in the record supports that finding. Cf. Matter of E.M., 581 N.E.2d at 955 (holding that while "a child may be declared a CHINS if the parent fails to take action to stop abusive treatment of the child by another[,]" the evidence did not indicate that E.M. was being abused by another).

II.
The second issue is whether the juvenile court's dispositional decree is in conformance with the controlling statute. The Halberstadts claim that the decree fails to meet the requirements of Ind.Code § 31-34-19-6. That statute provides:
If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
(1) is:
(A) in the least restrictive (most family like) and most appropriate setting available; and
(B) close to the parents' home, consistent with the best interest and special needs of the child.
(2) least interferes with family autonomy;
(3) is least disruptive of family life;
(4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
(5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.
Ind.Code § 31-34-19-6. Specifically, the Halberstadts claim that the decree fails to meet the statutory requirements in two ways.
First, the Halberstadts claim that the requirement that they undergo evaluations at the Indianapolis Institute "unnecessarily disrupts the family's freedom and family life, and imposes unnecessary restrictions on [A.H.] and her parents." Appellant's brief, p. 35. To support this claim, the Halberstadts note that they are voluntarily receiving counseling at the St. Vincent Stress Center and that Dr. Shaun Wood *700 testified that A.H. is receiving all the services she needs from her therapist at St. Vincent.
Initially, we point out that the court's requirement that the Halberstadts undergo evaluations at the Indianapolis Institute does not mean that the Halberstadts cannot continue their therapy at St. Vincent Stress Center. It merely means that they must also go to the Indianapolis Institute for an evaluation. The information gathered from the independent evaluation will then be used to develop "a comprehensive plan of care, treatment and rehabilitation." Record, p. 332. In addition, the juvenile court's dispositional order provided, "Upon completion of said evaluation, the court shall determine whether treatment is necessary and appropriate providers, if needed." Id. This suggests that, in the end, the Halberstadts may still see their therapists at St. Vincent.
Moreover, the BCOFC provided evidence to suggest that, contrary to the Halberstadts' allegation, A.H., Father, and Mother are not receiving all of the services that they need at St. Vincent Stress Center. For example, Dr. Wood, a staff psychologist at St. Vincent who conducted an initial psychiatric evaluation of A.H., and Carrie Schaefer-Robbins, the therapist whom A.H. saw at St. Vincent, both admitted that they were unaware that Father had molested A.H. on a number of occasions and that A.H. was a ward of the BCOFC. This evidence supports the trial court's finding that "[a]n independent evaluation of the family is therefore necessary" because the family's denial of the molestation "leaves doubt as to whether counseling has treated these incidents as inappropriate sexual acts and whether counseling has addressed the safety needs of the child." Record, p. 331. That finding supports the trial court's order that the family receive an independent evaluation at the Indianapolis Institute; therefore, this order is not clearly erroneous. See, e.g., Hallberg, 662 N.E.2d 639.
Second, the Halberstadts claim that the requirement that Father remain away from home "unnecessarily interferes with family autonomy, disrupts family life and restrains the freedom of the child's father." Appellant's brief, p. 35. To support this argument, the Halberstadts reiterate their claim that there is no credible evidence in the record to support the finding that Father molested A.H. We held above that the evidence in the record does support the juvenile court's finding that Father sexually abused A.H. See supra Part I. Therefore, we consider only whether that finding supports the juvenile court's decision to keep Father out of the home where A.H. is living.
Given the juvenile court's finding that Father sexually abused A.H., we cannot find fault in the court's decision to remove Father from the home. When child abuse has been established, "the state most certainly has a compelling interest in protecting the welfare of the child." In re Joseph, 416 N.E.2d 857, 860 (Ind.Ct.App.1981). The rights of a parent are not greater than the rights of a child whose growth and development have already been threatened by abuse. Id. Our goal when we look at the best interests of a child who has been determined to be a CHINS is to preserve or create "an environment conducive to the mental and physical development of the child." Id. In this case, the juvenile court determined that A.H. should stay at home with her mother, while Father resides outside the home. Record, p. 332. This judgment is not clearly erroneous. See, e.g., Hallberg, 662 N.E.2d 639.

III.
The final issue is whether the juvenile court's order must be reversed because the *701 BCOFC failed to provide a case plan to the Halberstadts as required by law. The Halberstadts claim that the BCOFC "never produced the case plan required by law." Appellant's brief, p. 30. First, the Halberstadts allege that the BCOFC failed to provide the family with a case plan within sixty days of A.H.'s first placement, as required by Ind.Code § 31-34-15-2.[4] Second, the Halberstadts allege that the case plan that the BCOFC eventually filed was unlawful because the BCOFC did not negotiate with the Halberstadts when developing the plan, as required by Ind.Code § 31-34-15-2. Finally, the Halberstadts claim that these two procedural failures by the BCOFC denied the Halberstadts their due process rights.
The Halberstadts specifically allege that their due process rights were violated by the juvenile court's order that they receive counseling at the Indianapolis Institute, instead of at St. Vincent Stress Center. The Fourteenth Amendment to the United States Constitution provides that "no person shall be deprived of life, liberty, or property without due process of law." U.S. CONST. amend. XIV. We have repeatedly noted that the right to raise one's children is more basic, essential, and precious than property rights and is protected by the Due Process Clause. In re M.M., 733 N.E.2d 6, 10 (Ind.Ct.App.2000). "Although due process has never been precisely defined, the phrase expresses the requirement of `fundamental fairness.'" Id. (citing E.P. v. Marion County Office of Family and Children, 653 N.E.2d 1026, 1031 (Ind.Ct.App.1995)). To support their argument that their due process rights were violated, the Halberstadts cite In re A.P., 734 N.E.2d 1107 (Ind.Ct.App.2000), reh'g denied, trans. denied.
In A.P., the parental rights of A.P.'s parents were terminated following a CHINS proceeding that involved more than five procedural irregularities, including the fact that the parents may not have ever received a copy of the case plan. Id. at 1112-1116. In that context, we discussed the fact that "procedural irregularities in a CHINS proceedings may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." Id. at 1112-1113.
Here, however, the Halberstadts' parental rights are not being terminated. Instead, the issues were whether A.H. was a CHINS and what services she and her family needed. We have previously distinguished CHINS and termination proceedings by discussing that "unlike a termination proceeding ... where an erroneous result obviously would be disastrous, an erroneous CHINS adjudication has a far less disastrous impact on the parent-child relationship." In re M.M., 733 N.E.2d at 10.
Assuming arguendo that the Halberstadts did not have an opportunity to negotiate with the BCOFC regarding A.H.'s case plan and that the BCOFC did not complete the case plan in a timely manner, we would not find that these procedural irregularities resulted in a violation of the Halberstadts' due process rights. We held above that there was sufficient evidence to support the juvenile court's finding that Father sexually abused A.H. See supra Part I. In addition, the juvenile court's decision to send the Halberstadts to the Indianapolis Institute was *702 not clearly erroneous because of concerns about how honest the Halberstadts were being with their therapists at St. Vincent. See supra Part II. Consequently, we do not believe that the CHINS findings or the resulting dispositional order would have been different if the BCOFC had negotiated with the Halberstadts or provided a more timely case plan. Therefore, no violation of the Halberstadts' due process rights occurred. Cf. In re A.P., 734 N.E.2d 1107.
For the foregoing reasons, we affirm the judgment of the trial court.
Affirmed.
KIRSCH, J. and MATTINGLY-MAY, J., concur.

ORDER
This Court having heretofore handed down its opinion in this appeal on June 4, 2001 marked "Memorandum Decision, Not for Publication"; and
The appellee, by counsel, having thereafter filed its Motion to Publish Opinion and this Court having voted to grant the appellee's petition, the Court now finds that the appellee's Motion to Publish Opinion should be granted and this Court's opinion in this appeal should now be ordered published.
IT IS THEREFORE ORDERED as follows:
The appellee's Motion to Publish Opinion is granted and this Court's opinion heretofore handed down in this cause on June 4, 2001 marked "Memorandum Decision, Not for Publication" is now ordered published.
NOTES
[1] The Halberstadts' "statement of the issues" contains five issues; however, their "argument" contains three sections with subparts. Appellant's brief, pp. 1-2, 14-37. Therefore, we address the three issues as raised in the Halberstadts' argument, instead of trying to conform the argument to the issues raised in the statement of the issues.
[2] Ind.Code § 31-34-1-1 provides:

A child is a child in need of services if before the child becomes eighteen (18) years of age:
(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
(2) the child needs care, treatment, or rehabilitation that the child:
(A) is not receiving; and
(B) is unlikely to be provided or accepted without the coercive intervention of the court.
Ind.Code § 31-34-1-2 provides:
A child is a child in need of services if before the child becomes eighteen (18) years of age:
(1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and
(2) the child needs care, treatment, or rehabilitation that the child:
(A) is not receiving; and
(B) is unlikely to be provided or accepted without the coercive intervention of the court.
Ind.Code § 31-34-1-3 provides:
A child is a child in need of services if before the child becomes eighteen (18) years of age:
(1) the child is the victim of a sex offense under:
* * * * *
(F) IC XX-XX-X-X
* * * * *
and
(2) the child needs care, treatment, or rehabilitation that the child:
(A) is not receiving; and
(B) is unlikely to be provided or accepted without the coercive intervention of the court.
[3] Ind.Code § 35-42-4-9 defines sexual misconduct with a minor in pertinent part as follows:

(a) A person at least eighteen (18) years of age who, with a child at least fourteen (14) years of age but less than sixteen (16) years of age, performs or submits to sexual intercourse or deviate sexual conduct commits sexual misconduct with a minor, a Class C felony. However, the offense is:
(1) a Class B felony if it is committed by a person at least twenty-one (21) years of age;....
Deviate sexual conduct is "an act involving... the penetration of the sex organ ... of a person by an object." Ind.Code § 35-41-1-9.
[4] That statute provides: "The county office of family and children, after negotiating with the child's parent, guardian, or custodian shall complete a child's case plan not later than sixty (60) days after ... the date of the child's first placement; or the date of a dispositional decree; whichever comes first." I.C. § 31-34-15-2.